UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

JEFFREY A. BROYLES,                    )
                                       )
                Plaintiff,             )
                                       )
v.                                     )     Case No. 13-CV-0102-CVE-TLW
                                       )
HOWARD-DCIII, LLC d/b/a SOUTH          )
POINTE CHRYSLER JEEP DODGE RAM,        )
and DEREK ELLIS,                       )
                                       )
                Defendants.            )

## OPINION AND ORDER

Now before the Court are the following motions: Defendants' Motion for Summary Judgment (Dkt. # 30); Defendants' Motion In Limine to Preclude Lay Opinion Testimony Regarding the Perceived Motivation for Actions or Events and Memorandum in Support (Dkt. # 35); Defendants' Motion In Limine to Preclude Evidence of Stray Remarks and Temporally Remote Comments and Memorandum in Support (Dkt. # 36); Defendants' Motion In Limine to Preclude Evidence Designed to Cause Unfair Sympathy and Memorandum in Support (Dkt. # 37); and Defendants' Motion In Limine to Preclude Evidence of Alleged Inappropriate Workplace Language and Memorandum in Support (Dkt. # 38). Plaintiff alleges that Howard-DCIII, LLC (South Pointe) has violated the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. (ADA), and the Oklahoma Anti-Discrimination Act, Okla. Stat. tit. 25, § 1101 et seq. (OADA), and that Derek Ellis (Ellis) has tortiously interfered with plaintiff's at-will employment contract. Plaintiff claims that he was harassed because of his disability, that South Pointe denied plaintiff reasonable accommodations for his disability, and that South Pointe terminated his employment because of his disability.

# I.

For the purposes of this motion, the following facts are undisputed.

South Pointe is a Delaware corporation.  Dkt. # 31, at 7; Dkt. # 44, at 6.  It owns and operates two car dealerships in Tulsa, Oklahoma: South Pointe Chevrolet and South Pointe Chrysler Jeep Dodge.  Dkt. # 31, at 7; Dkt. # 44, at 6.

In 2004, plaintiff was diagnosed with multiple sclerosis (MS).  Dkt. # 31, at 9; Dkt. # 44, at 6.  Because of his MS, plaintiff gets hot very easily.  Dkt. # 33-1, at 10.  Additionally, plaintiff cannot be on his feet for long periods of time.  Dkt. # 33-6, at 14.  However, others cannot tell whether the temperature is too hot for plaintiff or if plaintiff has been standing for too long unless plaintiff informs them of either fact.  Dkt. # 33-6, at 15.  The reasonable accommodations that plaintiff claims to have been denied are staying out of the heat, staying off of his feet for extended periods of time, and being able to leave work to attend a doctor's appointment.  Dkt. # 33-4, at 3; Dkt. # 44-3, at 33.

Plaintiff was employed by South Pointe from 2007 until March 12, 2012.  Dkt # 33-1, at 4.[1] Plaintiff was originally hired as an Internet manager.  Dkt. # 31, at 8; Dkt. # 44, at 6.  Plaintiff handled Internet sales and managed a team of approximately five or six employees.  Dkt. # 31, at 8; Dkt. # 44, at 6.

South Pointe has an Equal Employment Opportunity Policy.  Dkt. # 31, at 7; Dkt. # 44, at 6.  That policy states:

> If you require an accommodation to perform the essential functions of your job, you must notify your **Human Resources Representative**.  Once [South Pointe] is aware of the need for an accommodation, [South Pointe] will engage in an interactive

---

[1]     Plaintiff had been employed by South Pointe on two prior occasions.  Dkt. # 33-1, at 4.

> process to identify possible accommodations that will enable the employee to perform the essential functions of the job.
> If you believe that you have been treated in a manner not in accordance with these policies, please notify [South Pointe] immediately by contacting **your General Manager, Market Director, or Human Resources Representative. You may also report your complaint or concern using our toll free number** . . . .
> [South Pointe] prohibits all forms of unlawful harassment . . . which includes harassment or discrimination based on . . . disability . . . .

Dkt. # 33-14, at 3 (emphasis in original).  Plaintiff was provided an employee handbook, which contains a copy of the policy.  Dkt. # 33-1, at 15.  Plaintiff signed a document acknowledging that he had received the handbook and that he would familiarize himself with its contents.  Dkt. # 33-13, at 2-3.   Plaintiff also attended a training session on South Pointe's policies prohibiting discrimination and harassment.  Dkt. # 33-16, at 2.

During the summer of 2008 or 2009, plaintiff informed the general manager of the Chevrolet building, Mr. Nesnick, that, due to his MS, he needed the temperature to be cool.  Dkt. # 33-1, at 12; see also Dkt. # 44, at 15 (stating that the incident occurred in 2007); Dkt. # 55, at 2 (admitting that the incident occurred in 2007).  Nesnick disregarded this statement.  Dkt. # 44, at 15; Dkt. # 55, at 2.  When informed of this, Chris Anderson, South Pointe's general manager, suggested, jokingly, that plaintiff come to the Chrysler building, as that building had air conditioning.  Dkt. # 44, at 15; Dkt. # 55, at 2.

In late 2010, South Pointe eliminated its Internet department, and on February 1, 2011, plaintiff was promoted to used car sales manager, a position for which plaintiff was qualified.  Dkt. # 31, at 8; Dkt. # 44, at 6, 14, 15; Dkt. # 55, at 2.  Ellis, South Pointe's general sales manager, and

Anderson were both involved in the decision to promote plaintiff.  Dkt. # 33-22, at 2[2]; Dkt. # 31, at 9; Dkt. # 44, at 6.  At times, plaintiff would share an office with Clay Shafer, a fellow manager, and Chris Cox, plaintiff's lead.  Dkt. # 33-1, at 6; Dkt. # 44, at 15; Dkt. # 55, at 2.  Plaintiff informed Anderson that he had MS and that he could do the job of used car sales manager, but that he could not work out in the heat or be on his feet for long periods of time.  Dkt. # 44, at 15; Dkt. # 55, at 2.  Anderson told plaintiff that that would not be a problem.  Dkt. # 44, at 15; Dkt. # 55, at 2.  Plaintiff also informed Cox of the limitations caused by his disability.  Dkt. # 44, at 15; Dkt. # 55, at 2.  Additionally, plaintiff states that he informed Ellis that he had MS sometime between 2007 and 2011.  Dkt. # 33-2, at 12; see also Dkt. # 44-2, at 11.  Plaintiff never contacted human resources about his need for an accommodation.  Dkt. # 33-2, at 2.

Ellis was aware that plaintiff walked with a limp.  Dkt. # 44-2, at 10.  Plaintiff would drive between South Pointe's buildings because walking long distances was difficult.  Dkt. # 44-1, at 39.  Plaintiff had a handicap sticker for his car and would park in South Pointe's handicapped spaces.  Id. at 57.  At some point prior to February 2011, Ellis instructed plaintiff not to use South Pointe's handicapped parking because it was for customers, and asked why plaintiff would drive between the buildings.  Dkt. # 44, at 17; Dkt. # 55, at 2; Dkt. # 33-4, at 2.[3]  Instead of using the handicapped parking, plaintiff parked fifteen feet away from the door, a distance that plaintiff could walk without issue.  Dkt. # 31, at 14; Dkt. # 44, at 6.  Plaintiff did not report this incident to human resources or to any of Ellis's superiors.  Dkt. # 33-3, at 6.

---

[2]     Plaintiff states that Anderson promoted him and that he "would have no knowledge" of whether anyone else was involved in the decision.  Dkt. # 44-3, at 29; see also Dkt. # 33-4, at 7.

[3]     Ellis denies ever telling plaintiff that he could not park in a certain spot.  Dkt. # 44-2, at 13.

In June 2011, plaintiff worked outside during a tent sale, which lasted for two weeks. Dkt. # 44, at 16; Dkt. # 55, at 2. Cox was the only used car manager assigned to work inside during the tent sale. Dkt. # 44, at 16; Dkt. # 55, at 2. When plaintiff informed Ellis that his MS and the temperature outside prevented him from working outside all day, Ellis responded, "If you can't do the job, I have five others that can." Dkt. # 44-1, at 52 (internal quotation marks omitted); see also Dkt. # 44, at 16; Dkt. # 55, at 2.[4] Plaintiff did not report this incident to South Pointe's human resources department or to Ellis's superiors. Dkt. # 33-3, at 12. Ellis would often make the same statement to other employees. Dkt. # 33-23, at 2. During the tent sale, and at other times when plaintiff was working outside, Shafer would relieve plaintiff of his outdoor duties. Id. at 3. Additionally, plaintiff "wandered back inside" at some point during the tent sale. Dkt. # 33-3, at 11.

Cox and Shafer had a bet about how long plaintiff would last as a used car sales manager. Dkt. # 44, at 17; Dkt. # 55, at 2. The bet was related to plaintiff's MS. Dkt. # 44, at 17; Dkt. # 55, at 2.[5] Cox and Shafer informed plaintiff about the existence of the bet. Dkt. # 33-3, at 3. Plaintiff did not report the bet to South Pointe's human resources department or to anyone in management. Dkt. # 33-3, at 5.

When salespeople would approach Shafer requesting that he take a turnover,[6] Shafer would often send the salespeople to plaintiff. Dkt. # 44, at 18; Dkt. # 55, at 3. Plaintiff believes Shafer

---

[4]     Ellis denies ever being told about plaintiff's limitations. Dkt. # 44-3, at 10.

[5]     Cox claims that the bet was actually a joke about the differences between being an Internet manager and sales manager. Dkt. # 44-3, at 18.

[6]     Turnovers involve a manager assisting a salesman who needs additional help convincing a customer to purchase a vehicle. Dkt. # 44-1, at 32-33.

would send salesmen to him to force him to be on his feet more.  Dkt. # 44-1, at 43.  Handling turnovers was one of plaintiff's jobs as a sales manager.  Dkt. # 33-3, at 3.

Plaintiff states that Ellis, Cox, and Shafer harassed him because of his disability.  Dkt. # 44-1, at 29.  Plaintiff states that, on at least twenty occasions, Ellis would ask whether plaintiff was playing computer games or say that all plaintiff did was sit at his desk, doing nothing.  Id. at 43-46.  These comments were made in front of Cox, Shafer, and numerous salespeople.  Id. at 46.  Ellis would also call plaintiff lazy when plaintiff required a rest period off of his feet because of his MS.  Dkt. # 33-3, at 14.[7]  At one point, while telling plaintiff that he was lazy, Ellis said that he did not care what was wrong with plaintiff.  Id.  However, plaintiff does not recall Ellis ever making a comment about or saying anything about his MS.  Dkt. # 33-3, at 8.  Shafer acknowledges that Ellis harassed plaintiff.  Dkt. # 44, at 17; Dkt. # 55, at 2.  Bob VanHouse, a salesman, informed plaintiff that Ellis called him lazy and was complaining how plaintiff would sit at his desk and would not get up to work.  Dkt. # 44, at 18; Dkt. # 55, at 2; Dkt. # 33-6, at 10.

At some point prior to June 2011, Anderson took Ellis and plaintiff to lunch and attempted to have plaintiff tell Ellis about the issues plaintiff was having with Ellis.  Dkt. # 33-4, at 4.  Plaintiff declined to discuss his issues with Ellis.  Id. at 5.  At some point after June 2011, plaintiff "went to Mr. Anderson and told him how horribly that Mr. Ellis treated [him], and his response was, 'Well, you know how Derek [Ellis] is,' and walked away." Id.  At that time, plaintiff told Anderson that Ellis "treated [him] bad and some of the comments he would make and things of that nature." Id.

---

[7]     It is unclear from the evidentiary materials whether Ellis was aware that plaintiff was on a rest period, or even aware that he required one, at the time the comments were made.

Plaintiff required monthly treatments for his MS.  Dkt. # 33-6, at 8.  These treatments required plaintiff to receive an infusion for three hours.  Dkt. # 44-3, at 24.  These treatments required plaintiff to be away from his job.  Id.  However, plaintiff typically attempted to schedule his treatments on his day off.  Dkt. # 33-6, at 8.

In February 2012, plaintiff requested that he be allowed to leave work for his monthly MS treatment.  Dkt. # 44-3, at 33.  Ellis did not allow plaintiff to leave.  Id. at 25; see also  Dkt. # 44, at 18; Dkt. # 55, at 2.  Ellis cited a two manager rule, which required two managers to be on site at all times.  Dkt. # 44, at 18; Dkt. # 55, at 2.  This rule was imposed in February of 2012, when Shafer left South Pointe.  Dkt. 33-3, at 10.[8]  However, this rule was inconsistently applied; when Cox and Ellis went  on two hour lunches, plaintiff had been left behind as the only used car manager.  Dkt. # 44, at 18; Dkt. # 55, at 2.[9]  Plaintiff does not believe the two hour lunches were in anyway related to his MS, and he did not report the lunches to South Pointe's human resources department or to upper management.  Dkt. # 33-4, at 4.  Additionally, plaintiff states that he was not permitted a thirty minute, uninterrupted lunch break.  Dkt. # 33-17, at 3.

On March 10, 2012 (a Saturday), a customer, unable to find someone to assist him in looking at a car, stopped at plaintiff's office while plaintiff was having lunch.  Dkt. # 44, at 19; Dkt. # 55, at 2.  Plaintiff informed the customer that he could help him and attempted to find a salesman.  Dkt. # 44, at 19; Dkt. # 55, at 2.  Plaintiff was unable to find a salesman, and attempted to use South

---

[8]     Ellis denies the existence of a two manager rule.  Dkt. # 44-3, at 13.

[9]     The record is silent as to the circumstances of plaintiff's March 2012 MS treatment, the only other treatment that could have occurred between the alleged imposition of the two manager rule and plaintiff's termination.  The only doctor's visit that the record suggests plaintiff was denied leave to attend was the February 2012 treatment.

Pointe's speaker system to page a salesman. Dkt. # 44, at 19; Dkt. # 55, at 2. Plaintiff approached Ellis to inform him that plaintiff would be assisting the customer himself. Dkt. # 44, at 19; Dkt. # 55, at 2. Plaintiff was frustrated with his inability to find a salesman and the situation in general. Dkt. # 31, at 10; Dkt. # 44, at 8. Ellis told plaintiff, "I am getting sick and tired of you being such a dick to my customers." Dkt. # 44-1, at 26; see also Dkt. # 44, at 19; Dkt. # 55, at 2.[10] Plaintiff responded, "I'm sick and tired of you being a dick to me." Dkt. # 33-2, at 6; see also Dkt. # 31, at 10; Dkt. # 44, at 6.[11] "Ellis then told [p]laintiff to go home and [p]laintiff left." Dkt. # 31, at 10; Dkt. # 44, at 6.

Plaintiff returned to work on March 12, 2012 (the next business day). Dkt. # 31, at 10; Dkt. # 44, 6. Ellis told plaintiff that Ellis and Anderson had decided to go a different way, Dkt. # 33-17, at 4; see also Dkt. # 31, at 10; Dkt. # 44, at 6, and plaintiff was fired for insubordination. Dkt. # 44-3, at 5. Ellis was involved in the decision to terminate plaintiff's employment. Dkt. # 33-22, at 2.[12] Ellis testified that the sole basis for plaintiff's termination, and for Ellis's belief that plaintiff was insubordinate, was plaintiff's statement to Ellis on March 10, 2012. Dkt. # 44, at 19; Dkt. # 55, at 2. No customer had ever complained to Ellis directly, nor did Ellis ever discipline plaintiff beyond talking to him about his attitude. Dkt. # 44-2, at 8, 13.

---

[10]     Ellis denies making this statement. Dkt. # 44-2, at 8.

[11]     Ellis claims that plaintiff referred to him as a "'fucking dick.'" Dkt. # 33-22, at 2; see also Dkt. # 44-3, at 6.

[12]     There is a dispute as to whether Anderson was involved in the decision to terminate plaintiff. Ellis states that Anderson was involved in the decision to terminate plaintiff. Dkt. # 33-22, at 32. Plaintiff states that when he was leaving the dealership Anderson told plaintiff that "he was sorry, there were no hard feelings, and it wasn't his decision." Dkt. # 33-2, at 8. However, plaintiff's complaint states that Anderson ratified the decision to discharge plaintiff and plaintiff states that, at his termination meeting, he was told that Cox, Ellis and Anderson wanted to go in a different direction. Dkt. # 2-1, at 7; Dkt. # 44, at 19.

Plaintiff was aware that a single serious issue could result in immediate termination. Dkt. # 33-6, at 4. Plaintiff had seen South Pointe's insubordination policy. Dkt. # 33-6, at 3. The policy states that an employee must not "treat a supervisor or management official in an insubordinate manner in any respect." Dkt. # 33-15, at 2.

Employees at South Pointe's dealerships would curse. Dkt. # 44-2, at 2-3. There is no company policy that cursing is a workplace violation. Id. Ellis had previously texted plaintiff, "Did you fuck around and sell a suburban?" Dkt. # 44-4, at 2. Plaintiff believes that an employee referring to his supervisor as "a dick" was acceptable at South Pointe. Dkt. # 33-2, at 9; see also Dkt. # 31, at 10; Dkt. # 44, at 8.

Plaintiff completed an EEOC general intake questionnaire on March 17, 2012, and the questionnaire was received by the EEOC on March 20, 2012. Dkt. # 44, at 19; Dkt. # 55, at 2. On the questionnaire, plaintiff selected an option stating that he wanted to file a charge and that he wanted the EEOC to "look into the discrimination" that he had alleged. Dkt. # 44-6, at 11. A charge of discrimination was filed on June 13, 2012. Dkt. # 33-12, at 2. Plaintiff filed this suit on January 28, 2013. Dkt. # 2-1, at 3.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an

element essential to that party's case and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317.  "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252.  In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250.  In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

## III.

### I. ADA

### A. Timeliness

In order to bring a claim under the ADA, a charge must be filed within 300 days of the alleged discriminatory conduct.  42 U.S.C. § 12117 (incorporating the procedures of 42 U.S.C. § 2000e-5); 42 U.S.C. § 2000e-5(e)(1); Duncan v. Manager, Dep't of Safety, 397 F.3d 1300, 1308 (10th Cir. 2005).  "[A] charge is sufficient when the Commission receives from the person making

the charge a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of." 29 C.F.R. § 1601.12(b).  Additionally, the filing "must be reasonably construed as a request for the agency to take remedial action to protect the employee's rights or otherwise settle a dispute between the employer and the employee." Fed. Express Corp. v. Holowecki, 552 U.S. 389, 402 (2008).  An intake questionnaire does not necessarily constitute a charge; it must contain a request to act to constitute a charge. Id. at 405; see also Semsroth v. City of Wichita, 304 Fed. App'x 707, 713-14 (10th Cir. 2008) (holding that the plaintiffs' initial questionnaires constitute charges only where a plaintiff had also taken an additional step from which it could be inferred that the plaintiff had requested the EEOC to take action).[13]

Plaintiff's initial questionnaire is sufficient to constitute a charge.  The questionnaire identifies the parties and describes generally the actions complained of.  Additionally, the questionnaire makes clear that plaintiff wants the EEOC to take action; plaintiff checked a box that states that he wants to file a charge and that he wants the EEOC to look into the discrimination he described.  Plaintiff's initial questionnaire was complete on March 17, 2012.  Three hundred days prior to March 17, 2012, was May 22, 2011.  Any events that could not have plausibly occurred after May 22, 2011, are time barred.

Plaintiff's conversation with Nesnick, and Anderson's response to that conversation, are time barred.  Ellis's directive to plaintiff to not park in handicapped spaces is also time barred.  While it is unclear when some of the other alleged incidents occurred, it is at least plausible that they occurred after May 22, 2012, and they may be considered in this motion for summary judgment.

---

[13]     This and other unpublished opinions are cited for their persuasive value. See 10th Cir. R. 32.1(A).

11

However, time barred claims may be considered as part of a hostile work environment claim that arises from acts occurring within the three hundred day period.  As long as an act that contributed to the hostile work environment occurred within the three hundred day period, a court may consider acts outside of the three hundred day period if they comprise the same hostile work environment.  Duncan, 397 F.3d at 1308.  A series of events comprises the same hostile environment if they were perpetrated by the same managers, occurred relatively frequently, and involved the same type of employment actions.  Id.  The acts must be of the same "character."  Id. at 1309-10 (determining that "threatening physical and psychological harassment" was of a different character than "off-color comments and rumor-spreading").

Plaintiff's conversation with Nesnick is not part of the same hostile environment that plaintiff has alleged in his non-barred claims.  Nesnick was a different manager, plaintiff was working in a different position, and the comments occurred only once.  Likewise, Ellis's comments regarding handicapped parking are not part of the same hostile environment.  Ellis's alleged comments about handicapped parking occurred only once and were of a different character than Ellis's alleged comments disparaging plaintiff's work ethic or insisting that he remain outside at the tent sale.  Neither Nesnick's comments nor Ellis's comments about handicapped parking may be considered in plaintiff's hostile work environment claim.

## B.  Termination

The ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability in regard to . . . discharge of employees . . . ." 42 U.S.C. § 12112(a).  ADA discrimination cases are governed by the burden-shifting framework announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997).  Pursuant to this

12

framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. Id.  If he does so, "then the defendant must offer a legitimate, non-[discriminatory] reason for the employment action.  The plaintiff then bears the ultimate burden of demonstrating that the defendant's proffered reason is pretextual." Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d 1164, 1170 (10th Cir. 2006) (citations omitted).

In order to establish a prima facie case under the ADA, a plaintiff must demonstrate that "(1) that [he] is a disabled person within the meaning of the ADA; (2) that [he] is qualified . . . and (3) that the employer terminated [his] employment under circumstances which give rise to an inference that the termination was based on [his] disability." Morgan, 108 F.3d at 1324 (internal citations omitted).  The Tenth Circuit has described a plaintiff's burden to establish a prima facie case as "so light that only the most baseless of claims fails to satisfy it." Zamora v. Elite Logistics, Inc., 478 F.3d 1160, 1171 (10th Cir. 2007).  Defendants admit that plaintiff is disabled and, for the purposes of their motion for summary judgment, that plaintiff is qualified.  Dkt. # 31, at 19 & n.3.  For the purposes of this motion only, the Court assumes that plaintiff satisfied his burden to produce some evidence creating an inference of discrimination for his prima facie case.

South Pointe has met its burden of offering a legitimate, non-discriminatory reason for terminating plaintiff.  Plaintiff told his supervisor, "I'm sick and tired of you being a dick to me." Dkt. # 33-2, at 6; see also Dkt. # 31, at 10; Dkt. # 44, at 6.  That statement alone is a legitimate and non-discriminatory reason to fire plaintiff.

Therefore, in order to defeat a motion for summary judgment, the plaintiff must show that "there is a genuine dispute of material fact as to whether the employer's proffered reason for the

13

challenged action is pretextual-i.e., unworthy of belief." Randle v. City of Aurora, 69 F.3d 441, 451 (10th Cir. 1995). "Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Morgan, 108 F.3d at 1323 (quoting Olson v. Gen. Electric Astrospace, 101 F.3d 947, 951-52 (3rd Cir. 1996)) (further citation omitted) (internal quotation marks omitted).

Where "the employee was hired and fired by the same person within a relatively short time span, there is a strong inference that the employer's stated reason for acting against the employee is not pretextual." Antonio v. Sygma Network, Inc., 458 F.3d 1177, 1183 (10th Cir. 2006) (quoting Proud v. Stone, 945 F.2d 796, 798 (4th Cir. 1991)) (internal quotation marks omitted) (footnote omitted). The same actor inference applies where the employee was promoted and fired by the same person. Spears v. Patterson UTI Drilling Co., 337 Fed. App'x 416, 421 (5th Cir. 2009). However, this "same actor" evidence is merely an inference, not a presumption, and the plaintiff may present countervailing evidence of pretext. Id.

Plaintiff was promoted by both Anderson and Ellis. Plaintiff was fired by Ellis, and possibly Anderson. Plaintiff was fired approximately thirteen and a half months after his promotion. This constitutes a "relatively short time span." See Brown v. CSC Logic, Inc., 82 F.3d 651, 658 (5th Cir. 1996) (applying the same actor inference where the hiring and firing were four years apart), abrogated on other grounds by Russell v. McKinney Hosp. Venture, 235 F.3d 219 (5th Cir. 2000). The same actor inference applies and weighs against a finding of pretext.

Additionally, the temporal proximity between plaintiff cursing at his supervisor and his termination suggests the termination was not pretextual. Plaintiff was told to go home immediately after cursing at his supervisor, and was formally terminated the next business day. Conversely, plaintiff does not provide any evidence linking the timing of his termination to his disability.[14]

No reasonable jury could find defendant's proffered reason unconvincing. Plaintiff's arguments to the contrary due not raise a genuine dispute of material fact. Plaintiff argues that defendant's reason for firing plaintiff is unworthy of belief because employees at South Pointe cursed with relative frequency, because Ellis cursed with relative frequency, and because Ellis referred to plaintiff as being a dick before plaintiff responded in kind. The fact that employees curse frequently is inapposite; plaintiff was not terminated for cursing, plaintiff was terminated for telling his supervisor that he was "being a dick," which is insubordinate. Those acts are not of similar seriousness. See Riggs v. AirTran Airways, Inc., 497 F.3d 1108, 1120 (10th Cir. 2007) Likewise, the fact that Ellis cursed frequently and at plaintiff is not inconsistent with plaintiff being terminated for cursing at Ellis; Ellis was merely cursing at a subordinate or in a general manner, while plaintiff was cursing at his supervisor. One cannot be insubordinate by disrespecting a subordinate, but one can certainly be insubordinate by disrespecting a superior. While it may not be fair for plaintiff to be terminated for using the same language as his supervisor, a court will not question whether an employer's reason for terminating an employee was fair. Debord v. Mercy Health Sys. of Kan., Inc., 737 F.3d 642, 655 (10th Cir. 2013). Relatedly, plaintiff has failed to identify any similarly situated employees who were treated differently, e.g., any employees who cursed at their supervisors and

---

[14]     For example, plaintiff's claim of pretext would have been much stronger if he had been terminated immediately after informing Ellis that he could not stay outside during the tent sale in June 2011.

remained employed.[15]   However, the record does disclose that an employee was terminated for conduct similar to plaintiff's conduct.   See Dkt. # 44-3, at 37 (stating that a manager was fired for telling Ellis that he was a motherfucker and a dick).

Plaintiff also argues that Ellis's previous comments to plaintiff and the actions of plaintiff's coworkers demonstrate that South Pointe's proffered explanation was pretextual.   The actions of plaintiff's coworkers are irrelevant; plaintiff's coworkers did not terminate plaintiff's employment and their actions have no relation to Ellis and Anderson's motivations for terminating plaintiff's employment.   Additionally, plaintiff has failed to provide any evidentiary materials suggesting that Anderson, who may have taken part in the decision to terminate plaintiff's employment, had any

---

[15]   At a hearing before the Oklahoma Employment Security Commission, plaintiff stated that "every two or three months" he would witness "another employee speak to management and [call] him a dick, or [something] similar to that," and that those employees were not punished. Dkt. # 44-3, at 29.  Plaintiff has not identified any of these alleged employees, any of their supervisors, or any of the dates on which these incidents occurred, and has not provided any further details about the incidents.   It is impossible to determine if these unidentified employees are similarly situated, based upon plaintiffs cursory statements. Plaintiff therefore has failed to identify any similarly situated employees who were treated differently.

The record does state that an employee named Kit Jones was not fired despite running around the used car building while cursing, yelling, and complaining. Dkt. # 33-6, at 5. However, it is not alleged that Jones was cursing in anger at his supervisor.  Id. at 5-6. Plaintiff admits that Jones "was like very protected . . . he was best friends with [sic] Mr. Anderson's best friend . . . And he was very, very untouchable."  Id.  Any preferential treatment given to Jones relative to plaintiff is distinguishable and does not in any way render South Pointe's action incoherent; rightly or wrongly, Jones was treated better than plaintiff not because of plaintiff's disability, but because of Jones's connections. Additionally, Jones's conduct did differ from plaintiff's, in that plaintiff does not state that Jones angrily cursed at a supervisor, only that he ran down the halls cursing.

animus against plaintiff on account of his disability.[16]  While Ellis's comments may be sufficient to raise the inference that plaintiff's termination was based on his disability, they are insufficient to meet the higher burden of establishing pretext.  In light of the temporal relationship between plaintiff's statement and his termination, the applicability of same actor inference, and the inappropriateness of plaintiff's conduct, no reasonable jury could determine that South Pointe's proffered reason was pretextual.

Because plaintiff has failed to meet his burden of establishing that plaintiff's proffered reason for his termination was pretextual, defendants' motion for summary judgment should be granted as to this claim.

## C.  Reasonable Accommodations

The ADA prohibits discrimination "against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a).  Discrimination against a qualified individual on the basis of disability includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee."  Id. § 12112(b)(5)(A).

"The statute thus establishes a cause of action for disabled employees whose employers fail to reasonably accommodate them."  Selenke v. Med. Imaging of Colo., 248 F.3d 1249, 1261 (10th Cir. 2001).  Reasonable accommodations include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices,

---

[16]     There is no evidence that Anderson harbored any animus towards plaintiff at all.  See e.g., Dkt. # 33-2, at 8 ("[A]fter I was let go by Mr. Ellis . . . [Anderson] came up to my car door to shake my hand and tell me that he was sorry, there were no hard feelings, and it wasn't his decision.").

appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B); see also 29 C.F.R. § 1630.2(o).

"To facilitate the reasonable accommodation, '[t]he federal regulations implementing the ADA envision an interactive process that requires participation by both parties.'" Bartee v. Michelin N. Am., Inc., 374 F.3d 906, 916 (10th Cir. 2004) (quoting Templeton v. Neodata Servs., Inc., 162 F.3d 617, 619 (10th Cir. 1998)) (alteration in original). "However, before an employer's duty to provide reasonable accommodations—or even to participate in the 'interactive process'—is triggered under the ADA, the employee must make an adequate request, thereby putting the employer on notice." EEOC v. C.R. Eng., Inc., 644 F.3d 1028, 1049 (10th Cir. 2011). The request does not need to be in writing or use the "magic words" of "reasonable accommodation." Id. The employer need know only of both the disability and the employee's desire for accommodations. Id. However, "[t]he request for accommodation must be sufficiently direct and specific, giving notice that [the employee] needs a special accommodation." Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 23 (1st Cir. 2004) (quoting Reed v. LePage Bakeries, Inc., 244 F.3d 254, 259 (1st Cir. 2001)) (internal quotation marks omitted).

Plaintiff argues that, during June 2011, defendant failed to accommodate his inability to work in the heat.[17] Plaintiff correctly notes that Ellis responded to plaintiff's request to move inside by

---

[17]   Plaintiff alleges that he had been forced to work in the heat at other times as well. However, plaintiff does not provide any evidentiary materials regarding those alleged instances; there is nothing in the record describing when those instances occurred, how they occurred, what the circumstances leading up to the instances were, or if plaintiff informed anyone that he was too hot. These unsubstantiated instances are insufficient to allow plaintiff's claim to survive summary judgment.

stating that if plaintiff could not do the job, he would find someone else who could.  However, despite Ellis's comment, plaintiff was able to go inside the dealership and avoid the heat; plaintiff states that he "wandered back inside" during the tent sale despite Ellis's statement.  Additionally, Shafer, plaintiff's coworker, took plaintiff's place outside so that plaintiff could spend time out of the heat.  While Ellis's comment may have been unreasonable, South Pointe's actions were not.  Plaintiff was able to, and did, leave the heat without suffering any employment consequences.

Plaintiff also argues that Ellis's criticisms of plaintiff constituted a failure to provide reasonable accommodation.  It is unclear how Ellis's alleged statements, such as that plaintiff was lazy, constituted a failure to reasonably accommodate plaintiff.  Requiring that supervisors refrain from criticizing their employees is not a reasonable accommodation as defined by the ADA.  See 42 U.S.C. § 12111(9)(B).  Plaintiff suggests that Ellis's comments made him feel as though he needed to be on his feet.[18]  The record shows that plaintiff informed South Pointe employees that he could not be on his feet for extended periods of time.  However, plaintiff admits that others, such as his supervisors, cannot tell that he has been on his feet for too long unless plaintiff informs them of that fact.  Plaintiff fails to provide any evidentiary materials suggesting that he requested to spend less time on his feet, or even that he informed anyone that he was spending too much time standing.  A request for reasonable accommodations is an interactive process.  By failing to inform South Pointe that he was, in fact, spending too much time on his feet or providing them with any method of ascertaining when plaintiff was standing for too long, plaintiff failed do his part in the interactive process.

---

[18]     While it is not clear from the record that Ellis's comments resulted in plaintiff spending additional time standing, this Court will assume, for the purposes of this motion, that they had this effect.

Lastly, plaintiff claims that he has been denied reasonable accommodations because of one instance during February 2011 in which South Pointe denied plaintiff's request to attend a doctor's appointment during work hours.[19]  There is no evidence that plaintiff had any previous request to leave work to attend a doctor's appointment denied.  See Dkt. # 33-6, at 8 (plaintiff states that he typically scheduled his appointments on his days off, implying that he occasionally had his appointments on work days).  Ellis argued, in that one instance, that plaintiff should not leave work for a doctor's appointment, as it would leave South Pointe with too few managers.  Because Shafer had already left South Pointe when the request was made, there was no other manager to take plaintiff's place.  "Reasonable accommodation does not mean that the defendant must grant the plaintiff every moment off [he] asks for."  Rodriguez v. Loctite P.R., Inc., 967 F. Supp. 653, 664 (D.P.R. 1997).  There is "nothing unreasonable about refusing an employee's request to visit a doctor when no one was available to cover [his] shift.  That is especially true here, were [sic] the plaintiff admits to seeing physicians on a regular basis and yet can only point to a single instance in which [plaintiff] refused a request for time off for that purpose."  Id. at 664-65.  Because plaintiff has failed to provide sufficient evidentiary materials for a reasonable jury to determine that plaintiff has been denied a reasonable accommodation, defendants' motion for summary judgment should be granted as to this claim.

---

[19]    Plaintiff states in his deposition that the only reasonable accommodations that he could think of that he was denied involved heat and moving about.  Dkt. # 33-4, at 3.  Nonetheless, plaintiff has presented evidence that he was denied leave to go to a doctor's appointment, and this Court will analyze whether that refusal constituted a denial of a reasonable accommodation.

20

### D.  Hostile Workplace

A hostile work environment claim may be brought under the ADA.  <u>Lanman v. Johnson</u>

<u>Cnty., Kan.</u>, 393 F.3d 1151, 1155 (10th Cir. 2004).  A hostile work environment claim entails both

objective and subjective components.  <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993).  It is not

disputed that plaintiff subjectively believed that, taken as a whole, the alleged conduct was abusive.[20]

> For a hostile environment claim to survive a summary judgment motion, a plaintiff
> must show that a rational jury could find that the workplace is permeated with
> discriminatory intimidation, ridicule, and insult, that is sufficiently severe or
> pervasive to alter the conditions of the victim's employment and create an abusive
> working environment.

<u>Penry v. Fed. Home Loan Bank of Topeka</u>, 155 F.3d 1257, 1261 (10th Cir. 1998) (quoting <u>Davis</u>

<u>v. U.S.P.S.</u>, 142 F.3d 1334, 1341 (10th Cir. 1998)) (internal quotation marks omitted).  An employee

can proceed on either of two theories of discrimination: direct liability or vicarious liability.  <u>Debord</u>

<u>v. Mercy Health Sys. of Kan., Inc.</u>, 737 F.3d 642, 650 (10th Cir. 2013).  Plaintiff's filings do not

make clear which theory or theories plaintiff is pursing.

"An employer is subject to vicarious liability to a victimized employee for an actionable

hostile environment created by a supervisor with immediate (or successively higher) authority over

the employee."  <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 806-07 (1998).  If the alleged

harassment does not result in any tangible employment action being taken, an employer may raise

as a defense to a vicarious liability hostile work environment claim that the employee did not take

advantage of the employer's preventative or remedial apparatus.  <u>Id.</u>; <u>see</u> <u>also</u> <u>Ferraro v. Kellwood</u>

<u>Co.</u>, 440 F.3d 96, 101 (2d Cir. 2006) (applying the <u>Faragher</u> defense to a disability-based hostile

---

[20]     Plaintiff may not have subjectively believed that Ellis's cursing was abusive, as he
considered cursing within the workplace to be absolutely acceptable.  Dkt. # 33-2, at 9.

work environment claim); <u>Arrieta-Colon v. Wal-Mart P.R., Inc.</u>, 434 F.3d 75, 87 (1st Cir. 2006) (determining that a <u>Faragher</u> defense to a disability-based hostile work environment claim was inappropriate because one of the defense's elements was not met).[21]  This defense requires two elements: (1) that the defendant exercised reasonable care to prevent and correct any harassing behavior, and (2) that plaintiff unreasonably failed to take advantage of any corrective or preventive opportunities presented by the employer.  <u>Faragher</u>, 524 U.S. at 807.  The second element may be proven by showing that the employee failed to follow the employer's complaint procedure.  <u>Id.</u> at 808.

The first element actually has two sub-elements: (1) the employer must exercise reasonable care to prevent harassment and (2) the employer must exercise reasonable care to correct any harassment that does occur. <u>Debord</u>, 737 F.3d at 653.  The first sub-element may be proven by showing that the employer has adopted a harassment policy and distributed those policies via employee handbooks. <u>Id.</u> at 654.  The second sub-element requires the employer to show that it took proper action upon receiving proper notice of a harassment complaint.  <u>Helm v. Kan.</u>, 656 F.3d 1277, 1290 (10th Cir. 2011).   However, a vague complaint that fails to mention the unlawful harassment does not trigger the requirement to take proper action.  <u>See</u> <u>id.</u>; <u>see</u> <u>also</u> <u>Anderson v. Wintco Inc.</u>, 314 Fed. App'x 135, 140 (10th Cir. 2009) (determining that because employees failed to complain of harassment, the employer did not fail to investigate claims of harassment); <u>Giddens v. Cmty. Educ. Ctrs., Inc.</u>, No. 12-51050, 2013 WL 5405503, at *5-6 (5th Cir. Sept. 27, 2013)

---

[21]     Plaintiff argues that the <u>Faragher</u> defense is not available because plaintiff suffered a tangible employment action when he was fired.  However, the tangible employment action must be the result of the supervisor's harassment.  <u>Faragher</u>, 524 U.S. at 778.  As discussed, <u>supra</u>, plaintiff's termination was the result of his insubordinate comments to his supervisor, not because of harassment.

(concluding that, where an employee complains only of a supervisor's treatment of him and not of unlawful harassment, the employee has not shown the employer failed to exercise reasonable care to correct harassment).

South Pointe has adopted a harassment policy and has distributed that policy via an employee handbook. It therefore satisfies the first sub-element of the first element of the <u>Faragher</u> defense. South Pointe has also satisfied the second sub-element of the first element. There is no evidence in the record that it has failed to take proper action upon receiving proper notice of harassment. Plaintiff's only complaint was that Ellis treated him horribly. Dkt. # 33-4, at 4. While plaintiff told Anderson some of the comments made by Ellis, none of Ellis's comments explicitly references plaintiff's MS.[22] This vague complaint fails to mention any unlawful harassment. It merely complains of how plaintiff's supervisor, Ellis, treats plaintiff.[23] The second element of the <u>Faragher</u> defense is fulfilled for the same reason; plaintiff failed to follow South Pointe's complaint procedure because plaintiff failed to report that he was being harassed on the basis of his disability. Plaintiff informing Anderson that he was merely being treated poorly fails to take advantage of South Pointe's remedial apparatus. South Pointe had no way of knowing that plaintiff was being subject to an, allegedly, hostile work environment unless he reported that he was being harassed on the basis

---

[22]   The closest is Ellis's comment that "he didn't care what was wrong with [plaintiff]." Dkt. # 33-3, at 14. However, even this comment fails to make clear that plaintiff was being harassed because of his disability; it could easily refer to any number of failings Ellis may have believed plaintiff had in regard to his work performance.

[23]   Conversely, when Will Franklin, an African-American employee, called South Pointe's whistleblower line to complain about a general manager's derogatory comment relating to his race, the general manager was told to "really watch what you're doing." Dkt. # 33-3, at 12-13. Franklin was promoted shortly thereafter. <u>Id.</u> at 13.

of his disability.  Plaintiff's silence ensures that South Pointe may avail itself of the <u>Faragher</u> defense.  South Pointe may not be held vicariously liable for a hostile work environment.[24]

"An employer is directly liable for a hostile work environment created by any employee if the employer's negligence causes the actionable work environment." <u>Debord</u>, 737 F.3d at 650 (quoting <u>Baty v. Willamette Indus., Inc.</u>, 172 F.3d 1232, 1241 (10th Cir. 1999), <u>overruled on other grounds by</u> <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101 (2002)) (internal quotation marks omitted).  To avoid summary judgment, plaintiff "must present evidence that would allow a reasonable jury to find that [South Pointe] 'had actual or constructive knowledge of the hostile work environment but did not adequately respond to the notice of the harassment.'" <u>Chapman v. Carmike Cinemas</u>, 307 Fed. App'x 164, 174 (10th Cir. 2009) (quoting <u>Harsco Corp. v. Renner</u>, 475 F.3d 1179, 1186 (10th Cir. 2007)).  As discussed <u>supra</u>, South Pointe had no actual knowledge of the allegedly hostile work environment, because plaintiff failed to adequately report it.

Likewise, plaintiff has failed to provide evidentiary materials suggesting that South Pointe had constructive knowledge of the allegedly hostile work environment.  Constructive knowledge requires that an employee establish the existence of harassment and that "the incidents of harassment [be] 'so egregious, numerous, and concentrated as to add up to a campaign of harassment." <u>Debord</u>, 737 F.3d at 642 (quoting <u>Adler v. Wal-Mart Stores, Inc.</u>, 144 F.3d 664, 675 (10th Cir. 1998)).  The allegations in this case do not meet that high standard.  <u>See</u> <u>e.g.</u>, <u>Hirase-Doi v. U.S. W. Commc'ns, Inc.</u>, 61 F.3d 777, 780, 784 (10th Cir. 1995) (finding a genuine issue as to whether an employer had

---

[24]   Even if the <u>Faragher</u> defense were not available to South Pointe, it would not be vicariously liable for any action taken by Shafer.  Vicarious liability applies only to hostile work environments created by a supervisor.  <u>Faragher</u>, 524 U.S. at 777.  Shafer was not a supervisor of plaintiff.  It is unclear from the record whether Cox, as lead manager, was a supervisor of plaintiff.  If he were not, South Pointe would not be liable for his actions.

constructive knowledge of harassment where the alleged conduct included eight to ten employees being harassed within a three month span and the alleged conduct included a male employee persistently requesting sex, making "open-ended invitations to all female employees to satisfy his sexual desires," attempting to kiss one female employee and brushing her breast, passing another coworker an explicit note, and grabbing a third employee between her legs), abrogated on other grounds by Burlington Indus, Inc. v. Ellerth, 524 U.S. 742 (1998), and Faragher, 524 U.S. 775. Because no reasonable jury could find that South Pointe had knowledge of the allegedly hostile work environment, South Pointe may not be held directly liable for a hostile work environment.

Even if South Pointe had knowledge of the alleged harassment, plaintiff's claim would still fail because the conduct alleged by plaintiff is insufficiently severe and pervasive.  An employee must allege that the harassment disrupts his job performance, and conduct is not actionable merely because it is "insensitive, tasteless, or vulgar."  Bertsch v. Overstock.com, 684 F.3d 1023, 1028 (10th Cir. 2012).

> To evaluate whether a working environment is sufficiently hostile or abusive, we examine all the circumstances, including: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance.

MacKenzie v. City and Cnty. of Denver, 414 F.3d 1266, 1280 (10th Cir. 2005).   A court must consider the severity of the harassment under a subjective and objective standard.  Witt v. Roadway Exp., 136 F.3d 1424, 1432 (10th Cir. 1998).  The ADA "is neither a 'general civility code' nor a statute making actionable the 'ordinary tribulations of the workplace.'" Anderson v. Coors Brewing Co., 181 F.3d 1171, 1178 (quoting Gunnell v. Utah Valley State College, 152 F.3d 1253, 1265 (10th Cir. 1998)).  "Accordingly, the run-of-the-mill boorish, juvenile, or annoying behavior that is not

25

uncommon in American workplaces is not the stuff" of a hostile work environment claim.  Morris v. City of Colo. Springs, 666 F.3d 654, 663 (10th Cir. 2012) (referring to hostile work environment claims under Title VII).

The comments made by Ellis, which do not explicitly reference plaintiff's MS, do not rise above the level of ordinary tribulations of the workforce.[25]  The bet between Cox and Shafer regarding how long plaintiff would be able to stand his job is quintessentially boorish behavior, not severe conduct.  That Ellis declined to invite plaintiff to lunch may be uncivil, but it hardly alters the conditions of plaintiff's employment.  Plaintiff being asked by a coworker to handle some of the coworker's turnovers, a task that is part of plaintiff's own job, and being asked to work outside at the tent sale, again, a task that is part of plaintiff's job, is not evidence of discrimination.  None of plaintiff's allegations involves an employee physically threatening or humiliating plaintiff.  Plaintiff's work performance was not affected by his coworker's actions; indeed, plaintiff argues that he was a model employee.  No reasonable jury could conclude that the harassment alleged by plaintiff is sufficiently severe and pervasive to constitute a hostile work environment under the ADA.[26]  Defendant's motion for summary judgment should be granted as to this claim.

---

[25]    The fact that Ellis cursed is particularly irrelevant, as plaintiff believed cursing was absolutely acceptable in his work environment and that he himself swore in the workplace. Dkt. # 33-2, at 9; Dkt. # 44-3, at 33.

[26]    This would be true even if none of plaintiff's allegations was time barred.  Neither the conversation with Nesnick, nor Ellis's statements about parking, were particularly hostile or abusive.

## II.  OADA

The Tenth Circuit has determined that a plaintiff's OADA claim fails if his federal discrimination claims fail.  See Barzellone v. City of Tulsa, No. 99-5088, 2000 WL 339213, at *5 (10th Cir. Mar. 31, 2000); Anthony v. City of Clinton, No. 98-6188, 1999 WL 390927, at *8 n.6 (10th Cir. June 15, 1999); LeFlore v. Flint Indus., Inc., No. 98-5024, 1999 WL 89281, at *3 n.4 (10th Cir. Feb. 23, 1999) (affirming district court's holding - unchallenged on appeal - that the legal analysis for plaintiff's OADA claim was the same as his ADEA claim); Wilson v. State Ins. Fund ex rel. Okla., No. 96-6100, 1997 WL 12929, at *2 (10th Cir. Jan. 15, 1997) ("For essentially the same reasons set forth in our analysis of the ADA claim, plaintiff's state statutory claims also fail."); see also Okla. Stat. tit. 25, § 1350(F) ( "The defending party may allege any defense that is available under . . . the Americans with Disabilities Act . . . ."  ); Stanley v. White Swan, Inc., No.  CIV-00-1291-F, 2002 WL 32061753, at *11 (W.D. Okla. Sep. 26, 2002) ("Because the protections provided by [the OADA] are co-extensive with the protections provided by federal law under the ADA, plaintiff's claim of handicap discrimination in violation of state law fails for the same reasons her federal claim fails.").  Because plaintiff's claims under the ADA have failed, plaintiff's OADA claims must also fail.  Defendants' motion for summary judgment should be granted as to these claims.

## III.  Tortious Interference

Plaintiff has abandoned his tortious interference claim.  Dkt. # 44, at 13.  Summary judgment should be granted as to this claim as well.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment (Dkt. # 30) is **granted**.  A separate judgment is entered herewith.

**IT IS FURTHER ORDERED** that Defendants' Motion In Limine to Preclude Lay Opinion Testimony Regarding the Perceived Motivation for Actions or Events and Memorandum in Support (Dkt. # 35), Defendants' Motion In Limine to Preclude Evidence of Stray Remarks and Temporally Remote Comments and Memorandum in Support (Dkt. # 36), Defendants' Motion In Limine to Preclude Evidence Designed to Cause Unfair Sympathy and Memorandum in Support (Dkt. # 37), and Defendants' Motion In Limine to Preclude Evidence of Alleged Inappropriate Workplace Language and Memorandum in Support (Dkt. # 38) are **moot**.

**DATED** this 30th day of January, 2014.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE

28